IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL IMMIGRANT JUSTICE CENTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 12 C 5358 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The National Immigrant Justice Center (NIJC) is a non-profit organization whose stated mission is to obtain access to justice and human rights protections for immigrants, refugees, and asylum seekers. In April 2011, NIJC submitted a request under the Freedom of Information Act (FOIA) to the United States Department of Homeland Security (DHS) and United States Immigration and Customs Enforcement (ICE). It asked these agencies to produce documents relating to immigrant detention facilities. When no documents were produced, NIJC filed suit, in July 2012. Nearly two years later, DHS and ICE still had not produced the requested documents, even though NIJC narrowed its request significantly after it filed this lawsuit.

The NIJC has moved for summary judgment,[1] and DHS and ICE have cross-

---

[1] In its opening brief, NIJC also requested attorney's fees. Pl.'s Opening Br. at 21-28. On April 15, 2014, the Court deferred consideration of this request. Dkt. No. 72.

moved for summary judgment, arguing that they have conducted a reasonable search for responsive documents. In their cross-motion, the agencies ask the Court to permit them to continue producing documents on a rolling basis, once a month, until production is complete. They offer no anticipated completion date, however. The Court also notes that although it has had the present motions under advisement for an inordinately long time—for which it apologizes to the parties—the agencies have not come back to advise that they have completed production or even that they have made significant progress toward conclusion of the production process. Nor is it apparent that the agencies have even *identified* all responsive records.

For the reasons stated below, the Court denies the agencies' motion for summary judgment. The Court also finds that the agencies have not conducted a search reasonably calculated to identify and produce documents responsive to NIJC's FOIA request and therefore grants NIJC's motion. The Court also sets a final deadline for production of all remaining responsive documents.

## Background

DHS and ICE house immigrant detainees at a variety of detention facilities, both governmental and private, pursuant to contracts and intergovernmental agreements. The agencies also periodically evaluate and audit these detention facilities. The NIJC contends that "[i]t is crucial to [its] mandate to obtain information regarding the government's detention of non-citizens . . . ." Pl.'s Opening Br. at 3.

On April 27, 2011, NIJC filed with DHS and ICE a FOIA request seeking documents relating to immigrant detention facilities. Specifically, NIJC requested the following:

1.      Please provide copies of all intergovernmental service agreements ("IGSAs") executed at any point after 2002 between ICE or DHS and any state, municipal or county entity;

2.      Please provide copies of all IGSAs executed at any point after 2002 between federal agencies other than ICE and DHS, including the U.S. Marshals, the Office of the Federal Detention Trustee, and the former Immigration and Nationality Service, with any state, municipal or county entity, which are in possession of ICE or DHS;

3.      As to any IGSA contract extensions executed after 2002 between ICE, DHS, or other federal agencies, please provide the contract extension as well as the original contract, if not provided pursuant to paragraph 1 or 2 of this request;

4.      Please provide copies of all contract detention facility agreements ("CDFs") currently in effect to house immigrant detainees at any privately-owned facility, including those executed by ICE or DHS, and those executed by other federal agencies which are in possession of ICE or DHS;

5.      Please provide copies of all current agreements or Memorandums of Understanding ("MOUs") with any other federal entity to house immigrant detainees;

6.      Please provide copies of all records related to reviews, audits, and inspections conducted by DHS/ICE/ERO [DHS's branch for Enforcement and Removal Operation] or any other governmental entity; or by any private entity contracted by ICE/ERO, such as the Nakamoto Group; or in facilities that house immigrant detainees for fiscal years 2007, 2008, 2009, 2010, and 2011;

7.      Please provide copies of any ratings assigned by ICE, DHS, or ERO to any IGSA, CDF, or federal facility employed to house immigrant detainees, from 2007 to the present. Please also provide worksheets, evaluations and/or criteria requirements for any review, audit, or inspection conducted by DHS/ICE/ERO or by any other governmental entity; or by any private entity contracted by ICE/ERO, such as the Nakamoto Group; and

8.      Please provide any evaluations performed by any nongovernmental entity, such as the American Bar Association (ABA), for fiscal years 2007, 2008, 2009, 2010 and 2011, through the present.

*Id.* at 3-4.

The agencies received NIJC's FOIA request on May 3, 2011. On June 21, 2011,

they notified NIJC in writing that the "'ICE FOIA Library'" section of the ICE website

contained information addressing requests one through three and five through eight.

Pl.'s Compl., Ex. B at 2. The agencies stated that request four was "still out for

processing" and that they had "queried the appropriate offices within ICE for responsive

records." *Id.*

On August 26, 2011, NIJC informed the agencies in writing that many of the

documents it sought were unavailable on the ICE website and that the agencies'

response to requests one through three and five through eight was therefore

incomplete. On October 22, 2011, the agencies sent NIJC a letter that indicated they

had treated NIJC's August 26 correspondence as an appeal of the adequacy of the

search. They "remanded" the matter to the ICE FOIA office for "processing and re-

tasking to the appropriate agency/office(s) to obtain any responsive documents." Pl.'s

Compl., Ex. D at 1.

On March 20, 2012—about eleven months after submitting the FOIA request—

NIJC filed an internal appeal because it still had not received even a single document

responsive to its FOIA request. Compl., Ex. E at 1. NIJC stated that "pursuant to 5

U.S.C. § 552(a)(6)(A)(ii), we expect you will make a determination with respect to our

appeal within twenty days . . . after the receipt of our appeal. " *Id.* at 4. On April 18,

2012, the defendants acknowledged the appeal and noted that "[w]hile we will make

every effort to process your appeal on a timely basis, there may be some delay"

because "[a] high number of FOIA/PA requests have been received by the Department."

Pl.'s Compl., Ex. F at 2. On June 1, 2012, the agencies again "remanded" the matter to

the ICE FOIA office "so that they may complete their processing of these records and provide a direct response to [the NIJC]." Pl.'s Compl., Ex. G at 2. The defendants stated that "[d]ue to the voluminous nature of your request, the ICE FOIA Office anticipates that an interim release of responsive records will be complete by June 29, 2012." *Id.* June 2012 came and went, however, with no interim release of records.

By the end of June 2012, fourteen months had passed from the filing of NIJC's FOIA request, and it still had received not a single document. On July 9, 2012, NIJC filed the present lawsuit, seeking a declaratory judgment that defendants' search for records was inadequate and an order directing them to produce all responsive documents by a date certain.

On September 17, 2012, the Court held an initial scheduling conference / status hearing in the case. The Court held the conference in chambers per its usual practice. The Assistant United States Attorney representing the agencies told the Court and counsel for NIJC that the agencies had initially estimated that it would take them eighty-eight weeks to complete production of the requested records but that he had been able to get them down to forty weeks. The Court notes that forty weeks from September 17, 2012 would have been approximately the end of June 2013. (Eighty-eight weeks would have been approximately the end of May 2014.)

From November 1, 2012 to March 27, 2013, the agencies released about 11,000 pages of documents, with some document production occurring approximately every two weeks. This, however, did not get the agencies anywhere close to full compliance, even though by the end of March 2013 twenty-seven weeks had passed since the initial scheduling conference. In March 2013, NIJC offered to narrow the scope of its request

from documents relating to 250 detention facilities to documents relating to the "top 100" based on the number of detainees. Pl.'s Opening Br. at 7. NIJC says that it narrowed its request because the documents it had received at that point were "largely unresponsive," and it wished to "expedite production and help lessen the burden on the Federal Defendants . . . ." *Id.*

From April 12, 2013 to May 2013, the agencies produced about 800 pages of documents. Around June 2013, they asked NIJC to further narrow its request by accepting summary review reports of the facilities in lieu of quality control checklists. NIJC agreed, but it reserved the right to review the reports and request the checklists if it still needed them.

By the end of July 2013—*after* the full compliance date that the agencies' attorney had set at the initial scheduling conference–the agencies were still nowhere near full compliance with NIJC's requests, despite the fact that NIJC had twice narrowed them significantly. From August 1 to September 24, 2013, the agencies released approximately 3,000 pages of documents. Despite this, however, they were still just scratching the surface.

On November 7, 2013, the Court held another status hearing. At this point, the Court allowed discovery to proceed, largely to enable NIJC to obtain evidence regarding the nature and location of responsive records that had not been produced. The Court set a discovery deadline of February 10, 2014 and hoped that this would spur the agencies to do a better job complying with the FOIA request. (NIJC contends that the agencies agreed at this hearing to complete production of records by February 7, 2014, but the transcript does not support this assertion. *See* Defs.' Ex. F.)

During a January 21, 2014 status hearing, the Court asked the Assistant United States Attorney representing the agencies whether they had "produced in 45 weeks all of the documents that [the attorney] had originally told [the Court] . . . [they] were going to produce in 40 weeks . . . ."  Defs.' Ex. G at 3.  Counsel replied, "Yes."  Then, however, he proceeded to back-track.  He said that the agencies had initially assumed "that all of the summary review reports and all of the contracts were within [the] original accumulation of documents.  That's what proved not to be correct. . . . The assumption was that those documents were within the group that was still being produced and gathered in the original search."  *Id.* at 4, 9 (internal quotation marks omitted).  The bottom line was that defense counsel conceded that the agencies had not met their earlier commitment, though counsel attributed this to a mistake on their part.

At the same January 2014 status hearing, defendants' attorney seemed to suggest that NIJC had actually increased the agencies' production burden by modifying its original FOIA request:  "Since the completion of the production of the documents in the original search, NIJC requested the government detention contracts and inspection reports relating to the 100 specified institutions that were not included in the original disclosure."  *Id.* at 9 (internal quotation marks omitted).  The suggestion was incorrect; the production burden had been narrowed by NIJC, not increased, and there is not a speck of evidence that would support a contention that anything NIJC did put the agencies to an increased burden.  That aside, however, defendants' attorney stated that he was "confident that we're almost there at the point where we know where all the documents are and we'll have them pulled.  They're actually pulled onto disks.  Those are not redacted at this point . . . ."  *Id.* at 11.

Despite this, NIJC contends that as of February 10, 2014, the defendants had not satisfied more than fifteen percent of its narrowed FOIA request.  The Court notes that this was *seventy-three weeks* after the initial scheduling conference, when the agencies' counsel represented that they would reach full compliance in forty weeks.

According to NIJC, the defendants had produced the following as of April 4, 2014, when NIJC filed its motion for summary judgment:

- 22 of 100 IGSAs, including 5 incomplete records;

- 9 of 100 Review and Audit Reports for the Year 2007;

- 16 of 100 Review and Audit Reports for the Year 2008, including 2 incomplete records;

- 31 of 100 Review and Audit Reports for the Year 2009, including 10 incomplete records;

- 38 of 100 Review and Audit Reports for the Year 2010, including 13 incomplete records;

- 45 of 100 Review and Audit Reports for the Year 2011, including 10 incomplete records;

- 0 of 100 Audit Reports for the Year 2012; and

- 0 of 100 Audit Reports for the Year 2013.

Valenzuela Decl. ¶ 11.  NIJC states in its opening brief that "the Federal Defendants have failed to produce a single complete set of documents for any facility (i.e. facility contract and detention inspection reports for all years), much less the complete set of requested documents."  Pl.'s Opening Br. at 12.

Defendants argue in their response and cross-motion that they have released "the contractual documents that the federal defendants maintain on the detention facilities enumerated by the plaintiff."  Defs.' Opening Br. at 2.  They further say that

"ICE FOIA plans to process and release the remaining responsive documents on a rolling basis, with a production made by the seventh of each month until all of the responsive documents have been produced." *Id.*

As indicated earlier, both sides have moved for summary judgment. As of the date of NIJC's summary judgment motion—early April 2014—eighty weeks had passed since the agencies' attorney represented, on September 17, 2012, that they would take just forty weeks to comply in full with NIJC's requests. In other words, the agencies had by this time already taken twice as long as they told their lawyer, and he told the Court, that it would take them to complete production. And yet they were still nowhere near completion.

With their summary judgment papers, defendants have provided a series of affidavits from agency personnel regarding the search for records responsive to NIJC's request. The affidavit of Catrina Pavlik-Keenan, the chief FOIA officer at ICE, describes what was done initially to dole out responsibility for searching for responsive documents. Ms. Pavlik-Keenan also lists in mind-numbing detail how many pages of records were produced on particular dates. She also identifies the occasions on which NIJC agreed to narrow its requests. But she does not explain, or even hint at, what has taken the agency so long. More disturbingly, Ms. Pavlik-Keenan's affidavit appears to indicate that it was not until October-November 2013—a full two and one-half years after the agency's receipt of NIJC's FOIA request—that ICE specifically tasked personnel to search for inspection reports for the facilities in question. *See* Pavlik-Keenan Affid. ¶¶ 52-55. She offers no explanation for why it took so long to do this or why no such records were produced in the preceding thirty months.

Defendants have also provided two affidavits from Jerald Neveleff, the deputy assistant director of the ICE office that is responsible for the agency's contracts. Mr. Neveleff says that in November 2013, he was forwarded an e-mail request checking on the status of NIJC's FOIA request and referencing the litigation. Mr. Neveleff says that when he received the e-mail, he noted that it bore a date in late October 2013, and he inquired to ask the reason for the delay in getting it to him. Neveleff 1st Affid. ¶ 7. (One might regard it as rather ironic that an agency that had made so little progress in thirty months was concerned about a delay of a matter of a couple of weeks.) But neither Mr. Neveleff nor any other affiant offers an explanation for why no one had, prior to October-November 2013, taken responsibility for marshaling resources to respond to NIJC's request despite this Court's persistent prodding and, presumably, the prodding of government counsel.

That aside, Mr. Neveleff says that the e-mail he received in November 2013 identified fifty-eight facilities for which no contracts had been produced. (It is noteworthy that the agencies have provided no information regarding the process that led to this determination.) He says that he was able to ascertain that twenty-two of these had their contracts not with ICE but rather had "Department of Justice (DOJ) / US Marshals (and Office of the Federal Detention Trustee (OFDT)) contracts and agreements." *Id.* ¶ 9. More on that shortly. This left, Mr. Neveleff says, thirty-six facilities[2] as to which, as of November 2013, no contract had been produced. *Id.* This is a rather damning admission, and again, no effort is made to explain why this was the case. Mr. Neveleff says, however, that he saw to it that contracts for these facilities were obtained and

---

[2] It turns out that the number of contracts, according to Mr. Neveleff, is actually thirty-five, because two facilities were operated under the same contract. *Id.* ¶ 9.

burned to disk and were forwarded to the ICE FOIA office.  *Id.* ¶ 14.

Back, then, to the other twenty-two facilities.  The government takes the position that DHS and ICE have no obligation to produce the contracts for those facilities, because the contracting agency is within the Department of Justice, not DHS or ICE. These facilities, however, house ICE detainees, and Mr. Neveleff's affidavit indicates, rather unsurprisingly, that ICE has copies of the facility agreements and amendments that modify their terms and conditions.  *Id.* ¶ 11.  Yet despite having these documents, defendants have declined to produce them.

LaTonya Nowlin, an analyst with the ICE unit that processes and responds to FOIA requests, also provided an affidavit.  Her affidavit likewise largely concerns events that took place in 2013 (most of it in November-December of that year); she gives no explanation for what happened or did not happen before that.

Jeremy Thompson, the acting chief of information disclosure with ICE's Office of Enforcement and Removal Operations (ERO), describes in his affidavit a "re-tasking" of NIJC's FOIA request that led to processing of 20,000 pages of documents between December 2013 and March 2014.  He does not identify when the re-tasking was initiated or why.  And he provides only scant information about what happened between ICE's receipt of NIJC's request in April 2011 and late 2013.

Fernando Piniero, the deputy FOIA officer of ICE's FOIA office, provides information only on production of documents in April-May 2014.  Reginald Sakamoto, the chief of the detention monitoring unit at ERO's custody management division, provides no information about the search(es) at issue in this case.  Rather, he merely attempts to explain his deposition testimony that compliance with NIJC's FOIA request

has taken longer than any other FOIA request to ICE of which he was aware.  In his affidavit, Mr. Sakamoto does not retract or qualify this statement; rather, he attempts to explain that this was also the largest FOIA request to ICE of which he was aware. Sakamoto Affid. ¶ 7.  His explanation, however, falls short of suggesting a massive or backbreaking burden.  Rather, he states that for any given year, the inspection reports for a particular facility may be over 100 pages, and NIJC requested reports on 100 facilities for multiple years.  Ten thousand pages per year for seven years hardly suggests an undue search or production burden, let alone one that should have taken defendants over three years thus far.

Finally, a second affidavit from Jerald Neveleff provides information regarding additional facility contracts that, evidently, still had not been produced or even gathered as of the date of the affidavit, June 30, 2014.  Mr. Neveleff refers to the fifty-eight facilities identified in his earlier affidavit.  As discussed above, Mr. Neveleff's first affidavit said that "there were approximately fifty-eight (58) facilities that were not addressed through the FOIA office."  Neveleff 1st Affid. ¶ 9.  In his second affidavit, Mr. Neveleff replies to a comment about this in NIJC's response/reply brief.  He says the following:

> In plaintiff's Opposition/Reply, they state that federal defendants failed to explain why they only needed to produce "58" facilities.  See pg. 6 of plaintiff's Opposition/Reply.  ICE did not provide documents related to government-owned, contractor-operated service processing centers.  ICE does not use IGSAs to house detainees at its government-owned, contractor-operated processing centers.  Any contracts that ICE enters into at these facilities are for contracted services only.  [The affidavit then lists 5 "service processing centers."]

> For those Privately Owned Facilities listed in the final column of Federal Defendants' Exhibit M, instead of an IGSA, ICE uses a contract based under the Federal Acquisition Regulations (FAR) which has been

set by Congress and establishes guidelines on how the Government procures materials, products, and services. The facilities listed in Plaintiff's Opposition/Reply Exhibit A and cited in the final column of Federal Defendants' Exhibit M have not been produced by ICE-FOIA because it is my understanding that they require facility ownership review before they are released (See 6 C.F.R. § 5.8). [The affidavit then lists 6 facilities.]

Neveleff 2d Affid. ¶¶ 3-4.

## Discussion

Each side has moved for summary judgment. To be entitled to summary judgment, the moving party must show that "'there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law.'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). On cross motions for summary judgment, the court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). "As with any summary judgment motion, we review cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

## A. Adequacy of search

The FOIA is intended to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks omitted). A party that submits a FOIA request faces an "asymmetrical distribution of knowledge" because "the agency alone possesses, reviews, discloses, and withholds the subject matter of the request." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006). For this reason, the

statute imposes upon the agency the burden of sustaining its action. *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).

To prevail on summary judgment in a FOIA action, "the defending agency must show beyond material doubt [ ] that it has conducted a search reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotation marks omitted); *see also, e.g., Lee v. U.S. Attorney for S. Dist. of Fla.*, 289 F. App'x 377, 380 (11th Cir. 2008). The agency must show that it has made a good faith effort to conduct a search for the requested records, using methods that can be reasonably expected to produce the information requested. *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotation marks omitted). Conclusory statements that the agency has reviewed relevant files are insufficient—for example, an affidavit that the agency has reviewed files that would contain responsive information but that does not describe its approach to the search or identify the files searched. *Id.* The adequacy of an agency's search is measured by the reasonableness of the effort in light of the specific request. *Patterson v. IRS*, 56 F.3d 832, 841 (7th Cir. 1995).

If the agency meets its burden to show that it conducted a reasonable search, the burden shifts to the requester "to rebut the agency's evidence by showing that the search was not reasonable or was not conducted in good faith." *Lee*, 289 F. App'x at 380. *See also, e.g., Moffat v. U.S. Dep't of Justice*, 716 F.3d 244, 254 (1st Cir. 2013). It does not appear, however, that evidence of "bad faith" as such is necessary. Rather, if there is substantial doubt about the adequacy of the search, summary judgment in the agency's favor is inappropriate. *See, e.g., Iturralde v. Comptroller of Currency*, 315

F.3d 311, 314 (D.C. Cir. 2003).

The Court notes that nearly all of the cases cited in the parties' briefs consider only an agency's motion for summary judgment. The exception is *Prison Legal News v. Lappin*, 603 F. Supp. 2d 124 (D.D.C. 2009), in which a prison legal journal and the Federal Bureau of Prisons filed cross-motions for summary judgment regarding the adequacy of the Bureau's search for records responsive to the journal's FOIA request. Upon finding that it did "not have a sufficient affidavit before it from which it can conclude that the Bureau produced all responsive records in its possession and control," the court concluded that it "must grant the plaintiff's motion regarding the adequacy of the search." *Id.* at 128. The court ruled that the:

> Bureau must either conduct a new search . . . or it must provide the Court with an affidavit (or affidavits) from which the Court can find that the affiant has personal knowledge that the Bureau's search procedures and the searches actually conducted were reasonably designed to locate documents responsive to the plaintiff's request.

*Id.*

It is abundantly clear that the defendants are not entitled to summary judgment; they have not come close to showing that they conducted searches reasonably calculated to uncover all relevant documents. First, although a flurry of activity (comparatively speaking) seems to have begun in the late fall of 2013, the agencies have provided only sketchy details of what they did in the two-and-one-half years preceding that to search for relevant records. The only reasonable conclusion that may be drawn is that they did not conduct a reasonable search. The gaping holes in the agencies' production of documents during that extraordinarily long delay are virtually impossible to justify. It appears to be the case that, as NIJC points out, that the relevant

documents "are physically kept in central locations, and most of the records are redundantly kept on a searchable shared drive . . . . [T]he Federal Defendants could have literally walked over to these locations, or . . . performed a basic computer search and pulled the relevant files."  Pl.'s Reply at 4.

The agencies attempt to explain the delay by characterizing "the original FOIA request" as "extremely broad" because it "did not identify any particular file systems or specific documents."  Defs.' Opening Br. at 9-10.  This argument does not hold water. As NIJC argues, it "provided eight separate, narrowly tailored requests, each of which described the documents with as much particularity as NIJC could without having seen a responsive document."  Pl.'s Reply at 8.   The request was certainly narrower than some of the FOIA requests that courts have found to be overly broad.  *See, e.g., Missouri Coal. for Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1208 (8th Cir. 2008) ("The FOIA request solicited three broad categories of documents: 1. Each and every document that evidences a communication to or from a member of the Flow Frequency Study Technical Advisory Group . . . ."); *Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728, 731 (D.C. Cir. 2008) ("Stolt–Nielsen made a series of FOIA requests for a broad range of information . . . including . . . requests for 'all amnesty agreements entered into by the Antitrust Division from August 1993 to the present.'").  In contrast, NIJC cabined its request by referring to specific categories of records and to the specific offices and parties involved.

Second, as indicated earlier, defendants' attorney has suggested that NIJC increased the defendants' production burden, and hence the production timeline, by modifying its original request.  As the Court has already stated, that is simply not the

case.  NIJC *narrowed* its request; it did not expand the request's scope.  Specifically, it limited its request for 250 facilities to 100, and it limited its request for quality control checklists to summary review reports.  There is no viable basis for the agencies to contend that this made it harder for them to comply (the Court also notes that it was the agencies themselves that requested the second modification).

Finally, defendants say that the request covers a very large amount of documents.  Perhaps so, but as the Court has indicated, the agencies have offered no evidence supporting the proposition that this was the sort of back-breaking demand that they seem to suggest.  And they have offered only the barest of explanations for what, if anything, they did in the first two and one-half years after receiving NIJC's request to conduct a reasonable search and meet their FOIA obligations.

In sum, the record includes no evidence from which a determination may be made that there was even an attempt at a good faith search for records during this extended period.

Second, even after the agencies' apparent "re-tasking" of their response to NIJC's request near the end of 2013, identification and production of records took place at what fairly can be called a snail's pace.  By April 2014, nearly three years after NIJC submitted its FOIA request, only a modest fraction of responsive documents had been identified and produced.  The agencies cannot wipe from the slate their two-plus years of noncompliance by an apparent flurry of activity at the eleventh hour when they were under pressure as a result of pending litigation.

Third, the absence of a reasonable search conducted in good faith is shown by the agencies' broken commitments to the Court.  The Court refers here to the large

disparity between the amount of time the agencies, via their counsel, initially represented full production of responsive records would take and the much greater amount of time it has taken them to comply only partially with NIJC's narrowed request. As indicated earlier, in mid-September 2012, the agencies' attorney represented that it would take forty weeks for full compliance, that is, until the end of June 2013. The nature and tenor of counsel's representation to the Court (that through discussions, he had gotten the agencies to lower its estimate from eighty-eight weeks to forty) compels an inference that this was not a figure picked out of the air but rather one that resulted from discussion and consideration. Yet the agencies came nowhere near meeting the estimate—indeed they did not even meet the original, much longer estimate even though the requests were narrowed after that. This, together with the evidence previously discussed, strongly suggests that there was an extended period of hand-sitting, and that as indicated earlier this changed only when, during the course of the litigation, the agencies perceived themselves, rightly, to be under the gun.

For these reasons, defendants are not entitled to summary judgment. They have not shown that they conducted, in good faith, a search reasonably calculated to uncover all relevant documents. *See Morley*, 508 F.3d at 1114; *Nation Magazine*, 71 F.3d at 890. And based on the Court's review of the record, NIJC has shown that it is entitled to summary judgment. The record establishes the opposite of a reasonable search conducted in good faith, at least until very late in the day. As the Court has indicated, the agencies offer nothing to explain the extraordinary amount of time it took to produce even a modest quantity of documents. Both Neveleff's and Thompson's affidavits involve searches and production that appear to have begun a full two and one-half

years after the defendants received NIJC's FOIA request.  They do not explain what happened before.  Given that all of the evidence regarding the nature of the searches that were done is in the agencies' hands, the only reasonable inference that can be drawn is that the agencies effectively sat on their hands or ran around in circles for this extended period.  There is no evidence that they even attempted to conduct a reasonable search until, perhaps, they were under the gun as a result of this lawsuit.  And even then, their production of documents has proceeded at a pace that, if accepted, would defeat the purpose of the FOIA.

**B.     Injunctive relief**

      **1.     Timing of production**

NIJC contends that the agencies "should be required to expeditiously disclose the remaining documents that they have unjustifiably withheld" and cites cases in which courts have set production deadlines in cases involving unusually long delays.  Pl.'s Opening Br. at 19.  The agencies ask the Court to permit them to continue producing documents on a rolling basis, with some documents produced on the seventh of every month until production is complete.  But that is the course that the agencies have followed to date, and the Court has concluded that it was and is not reasonable, particularly given the extraordinarily long time the still-incomplete production has taken to date.

The Court acknowledges defendants' contention that redacting and otherwise processing the substantial number of documents involved in this production has contributed to the three-plus-year delay.  At the same time, courts have declined to allow general claims of backlogs and limited resources to justify a delay to the extent

involved here.  In *Donham v. U.S. Dep't of Energy*, 192 F. Supp. 2d 877 (S.D. Ill. 2002), cited by NIJC, the plaintiff filed suit to compel an expedited response to its FOIA request approximately two years after having made it.  The Department of Energy invoked 5 U.S.C. § 552(a)(6)(C), which authorizes courts to give agencies more than the twenty days stipulated in the FOIA to decide whether to comply with the request and (if applicable) promptly release the documents to the  requester.  The court recognized that the agency had "limited resources" and a "backlog of requests," but it declined to recognize either of these as an "'exceptional circumstance'" warranting a stay of the proceedings.  *Id.* at 882 (quoting section 552(a)(6)(C)).  The court noted that "Plaintiffs have already waited two years. Such delay is clearly inconsistent with the purpose of FOIA.  FOIA is intended to ensure the prompt disclosure of information, not its suppression . . . ."  *Id.*

In *Hamlin v. Kelley*, 433 F. Supp. 180 (N.D. Ill. 1977), also cited by NIJC, the defendant agencies filed a motion to stay under section 552(a)(6)(C) citing inadequate staff, insufficient funding, and a large number of requests.  In denying the request, the court noted that "Congress deliberately removed from the agencies the authority to delay FOIA requests for the reasons now raised by defendants because the agencies could not be trusted to keep their affairs regular with respect to these requests."  *Id.* at 182.  Unlike the agencies in *Donham* and *Hamlin*, the defendants have not rested their request for rolling production on section 552(a)(6)(C).  The cases are nonetheless instructive.  Allowing even more time for an already extraordinarily protracted production of records based on problems faced by many, if not all, government agencies would undermine the purpose behind the FOIA.

In summary, the defendants have taken *three years* to satisfy less than half of the NIJC's twice-narrowed production request and have not suggested that they have faced anything other than ordinary challenges in releasing the documents. The Court orders the defendants to produce all of remaining responsive documents within forty-five days of today's date, that is, by no later than March 21, 2015.

## 2. Content of production

The parties disagree to some extent about what documents the defendants still have to produce. NIJC argues that the defendants are obligated to release copies of inter-governmental agreements executed by federal agencies other than the defendants, including the U.S. Marshals Service and the Office of the Federal Detention Trustee, which are part of the Department of Justice. Defendants have declined to produce such records.

The answer to this is simple: defendants are required to produce the responsive records in their possession, even if some other agency may have generated those records. Under the FOIA, "[f]or requested materials to qualify as 'agency documents,' two requirements must be satisfied. First, an 'agency must either create or obtain the requested materials . . . . Second, 'the agency must be in control of the requested materials at the time the FOIA request is made.'" *Sikes v. United States*, 987 F. Supp. 2d 1355, 1364, n. 6 (S.D. Ga. 2013) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144 (1989)). In *Tax Analysts*, the Supreme Court defined "control" in terms of "an agency's possession of the requested materials, not on its power to alter the content of the materials it receives." *Tax Analysts*, 492 U.S. at 147.

As the Court has discussed, it is apparent from Mr. Neveleff's affidavit that the

agencies do, in fact, have copies of agreements executed by other agencies. They are required to produce these documents even if they did not generate them in the first place.

### 3. Cut-off date for production

The parties also disagree about the cut-off date for production. NIJC argues that the agencies should be required to produce inspection reports through fiscal year 2013. The agencies state that they are willing to include reports through fiscal year 2012, even though NIJC's request was submitted in May 2011. They invoke 6 C.F.R. § 5.4(a), which states that an agency "ordinarily will include only records in its possession as of the date the component begins its search for them." However, another date can be used so long as the agency "inform[s] the requester of that date." *Id.* Defendants also point to cases finding reasonable date-of-search cut-offs (i.e., covering documents that an agency possessed when it began its search). *McGehee v. CIA*, 697 F.2d 1095, 1100, 1104 (D.C. Cir. 1983). In *Edmonds Inst. v. U.S. Dep't of Interior*, 383 F. Supp. 2d 105 (D.D.C. 2005), for example, the court decided that a date-of-search cut-off was more appropriate than a date-of-release cut-off (i.e., including documents that the agency possessed before its release of documents to the requester). The court reasoned that "[e]very postponement in the release of the documents would require the agency to perform a new search to include all documents created before the new release date, which in turn would postpone the date of release once again." *Id.* at 111.

The Court acknowledges that a date-of-search cut-off is not entirely satisfactory in the present case, as it allows the defendants' delays to leave the NIJC with relatively dated information. As in *Edmonds*, however, a date-of-release cut-off would be

counterproductive to the overall goal of completing the production as quickly as possible going forward. Further, NIJC is not without recourse, as it is free to file a separate FOIA request for records dated 2013 and after. For these reasons, the Court directs the defendants to produce responsive records through the end fiscal year 2012, the time period to which they have already agreed.

### Conclusion

For the foregoing reasons, the Court grants NIJC's motion for summary judgment [dkt. nos. 60 & 66] and denies defendants' motion for summary judgment [dkt. nos. 59 & 76]. Counsel are directed to confer and prepare a draft form of judgment consistent with this decision and are to submit it to the Court by no later than February 6, 2015.

_____

MATTHEW F. KENNELLY
United States District Judge

Date: February 2, 2015